UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------
IN RE:

STATE STREET ASSOCIATES, L.P.                    CASE NO.  04-63673
                                                 Chapter 11
                          Debtor                 Jointly Administered
--------------------------------------------------------
IN RE:

STATE STREET HOUSES, INC.                        CASE NO.  04-63672

                          Debtor
--------------------------------------------------------
APPEARANCES:

HANCOCK & ESTABROOK, LLP                         DANIEL B.  BERMAN, ESQ.
Attorneys for Debtors                                 Of Counsel
1500 MONY Tower 1                                R.  JOHN CLARK, ESQ.
P.O. Box 4976                                    Of Counsel
Syracuse, NY 13201-4976

NIXON PEABODY, LLP                               ROBERT N. H. CHRISTMAS, ESQ.
Attorneys for New York State Mortgage Loan       Of Counsel
  Enforcement and Administration Corporation     GREGORY J.  MASCITTI, ESQ.
  New York State Urban Development Corp.          Of Counsel
  and New York State Project Finance Agency      WILLIAM S.  THOMAS, JR.
437 Madison Avenue                               Of Counsel
New York, NY  10022


Hon.  Stephen D.  Gerling, Chief U.S. Bankruptcy Judge


**MEMORANDUM-DECISION, FINDINGS OF FACT,**
**CONCLUSIONS OF LAW AND ORDER**


Before the Court is a motion filed on October 21, 2004, by New York State Mortgage

Loan Enforcement and Administration Corporation ("MLC"), as agent for the New York State

Urban Development Corporation ("UDC"), doing business as Empire State Development

2

Corporation ("ESDC")[1] and New York State Project Finance Agency ("PFA") (collectively the "UDC"), seeking relief from the automatic stay pursuant to § 362(d) of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330 ("Code").  Opposition to the motion was filed on behalf of State Street Associates, L.P. ("SSA") and State Street Houses, Inc. ("SSH") (collectively, the "Debtors") on November 18, 2004.

The motion was heard at the Court's regular motion term in Utica, New York, on November 23, 2004.  Following oral argument, the Court indicated that it would schedule an evidentiary hearing on the motion.  Originally scheduled for February 23, 2005, the evidentiary hearing was adjourned to March 17, 2005, on consent of the parties.  Ultimately, after a further consensual adjournment, two days of evidentiary hearings were held on May 12, 2005 and June 2, 2005.[2]  In order to allow both parties the opportunity to obtain transcripts of the hearings and to provide the Court with post-hearing memoranda of law, the matter was taken under submission by the Court on July 21, 2005.

### JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and subject matter of this contested matter

---

[1] David White ("White"), who is employed by ESDC as Senior Asset Manager, testified that UDC is a subsidiary of ESDC.  *See* Transcript of May 12, 2005 Hearing ("May 12th Tr.") at 9.  He testified that MLC administers the housing portfolios for which UDC is the mortgagee. *Id.*

[2] Pursuant to Code § 362(e), the Court finds that the 30 day period set forth therein has been waived by virtue of the need for an evidentiary hearing and consensual adjournments of said hearing.

3

pursuant to 28 U.S.C. §§ 1334, 157(a), (b)(1) and (b)(2)(A), (G) and (O).

## FACTS

On July 21, 1971, SSH borrowed $8,105,000 from UDC to construct and operate Kennedy Plaza Apartments ("Kennedy Plaza"), a 303 unit subsidized rental apartment complex located in Utica, New York.[3]  *See* UDC's Exhibit 1.  SSH is a New York corporation, which holds legal title to Kennedy Plaza.  SSA is a New York limited partnership and owner of the equitable interest in Kennedy Plaza.  Mathematical Bridge Corporation is a New York corporation and the managing general partner of SSA.  Mathematical Bridge Corp. provides accounting, tax and legal services to SSA and manages Kennedy Plaza.  Lanny Horwitz ("Horwitz") is the sole shareholder and president of SSH and Mathematical Bridge Corp., as well as the sole director of both corporations.  Horwitz is one of five employees of Mathematical Bridge Corp. and is the only one residing in Florida.

On January 3, 1972, the Debtors, UDC and the United States Department of Housing and Urban Development ("HUD") entered into an Interest Reduction Contract ("IRC") under Section 236 of the National Housing Act.  *See* Debtors' Exhibit C.  HUD is authorized by statute "to make interest reduction payments with respect to a rental or cooperative housing project owned by a private non-profit corporation or other private non-profit entity . . . which is financed under a state or local program providing assistance through loans, loan insurance or tax abatements."

---

[3] Since that date, UDC has loaned additional funds in connection with Kennedy Plaza and the parties have entered into various amended Notes and Consolidated Agreements. *See* UDC's Exhibits 2, 4-5 and 7-8.

*Id.*  The IRC provided for a cap of $396,697 in interest reduction payments per year for a period not to exceed 50 years.  *Id.* at 3.  For purposes of reflecting subsequent increases in UDC's loans to the Debtors, on August 1, 1975, the terms of the IRC were amended to provide for a new cap of $479,109.  *See* Debtors' Exhibit D.  The IRC was again amended on March 1, 1988, to reflect a cap of $538,381, in conjunction with the increased debt to UDC of $9,613,693 of which $9,343,779 was "attributable to the subsidized dwelling units."  *See* Debtors' Exhibit E.  Those payments equal approximately $45,000 per month ($538,381 ÷ 12 = $44,865).  White testified that between October 1981 and April 2005, HUD has paid approximately $12 million to UDC in connection with Kennedy Plaza.  *See* May 12th Tr. at 47 and Ds' Exhibits A and B.  According to Horwitz, the monthly debt service is actually approximately $60,000, resulting in a shortfall of approximately $15,000 per month.  *See* Transcript of June 2, 2005 Hearing ("June 2 Tr.") at 51.  The Debtors have not paid UDC since January 2002, according to White.[4]  *See* May 12th Tr. at 27.

In 1983 UDC and SSA, along with two other similarly damaged UDC financed parties, commenced an action against Dow Chemical ("Dow") for structural damage that occurred to the apartment complex as a result of the failure of a mortar additive, manufactured by Dow and known commercially as "Sarabond," which was used in the construction of the complex.  On July 31, 1985, the Debtors authorized UDC to direct and manage the Dow litigation on their behalf by means of the execution of Powers of Attorney ("POA").  *See* Exhibit B, attached to UDC's

---

[4]  Horwitz acknowledged that the Debtors stopped making regular monthly payments sometime in 1998 when a dispute concerning the distribution of certain settlement proceeds under the terms of an Amended Loan Restructuring Agreement ("Amended LRA") arose, as will be discussed below.  *See* June 2nd Tr. at 51-52.

Exhibit 33D.  Under the terms of a Loan Restructuring Agreement ("LRA"), dated July 31, 1985,

the Debtors assigned to UDC any settlement or award ("Settlement Proceeds") they might receive

in the Dow litigation in exchange for UDC granting the Debtors a ten year forbearance period.

*See* UDC's Exhibit 3.

Acting under the POAs, UDC finalized a settlement with Dow in April 1991 in the

amount of $20,000,000 ("Sarabond Settlement").  Following receipt of the funds on behalf of the

various plaintiffs whose mortgages were held by UDC, including the Debtors, a dispute arose

over the distribution of the proceeds.  In July 1992 the Debtors and UDC entered into a settlement

agreement ("Settlement Agreement"), which provided that the Debtors would receive $7,056,000

as their share of the Sarabond Settlement.  In the interim, an Amended LRA, made effective July

31, 1991, provided for an additional five year forbearance period.[5]  *See* UDC's Exhibit 6. The

Amended LRA also provided that

> [a]ny award . . . as a result of the [Dow] Litigation, or any portion
> of a settlement, or any portion of a settlement of the [Dow]
> Litigation . . . shall be assigned to UDC and allocated and
> distributed . . . in the following order of priority:
>
> (a) To accrued interest on the HUD Flexible Subsidy Loan,[6] then
> to the payment of the Two Million, One Hundred Seventy-three
> Thousand, Eight Hundred Nine ($2,173,809) Dollars principal
> thereof . . . .

*See id.* at Section 10 (amending Section 5.02 of the original LRA).

On July 16, 2002, SSH filed a voluntary chapter 11 petition in the United States

---

[5]  The forbearance was extended from July 31, 1985 until July 31, 1995 under the terms
of the LRA and to July 31, 2000 under the terms of the Amended LRA.

[6]  On August 5, 1985, SSA borrowed $2,173,809 from HUD, under its Flexible Subsidy
Loan Program, to finance repairs on Kennedy Plaza resulting from the Sarabond damage.

6

Bankruptcy Court for the Southern District of Florida following receipt of two default notices from UDC. *See In re State Street Houses, Inc.,* 305 B.R. 726, 731-32 (Bankr. S.D. Fla. 2002), *aff'd,* 305 B.R. 738 (S.D. Fla. 2003), *aff'd*, 356 F.3d 1345 (11th Cir. 2004). The case was dismissed on December 3, 2002 based on a finding of bad faith.[7] *Id.*

On May 28, 2003, UDC commenced an action against the Debtors in New York State Supreme Court, Oneida County ("New York State Court"), seeking to foreclose its mortgage lien on Kennedy Plaza based on alleged defaults in the Debtors' monthly payments.[8] On May 20, 2004, the New York State Court issued an order appointing a temporary receiver. In response to the New York State Court's order, the Debtors filed voluntary petitions pursuant to chapter 11 of the Code on May 21, 2004 in the Northern District of New York, and this Court signed an order on May 25, 2004, providing for joint administration of the two cases.

According to the Debtors' schedules, UDC holds a secured claim for accrued interest of $2,947,247.24, which Debtors identify as "disputed." *See* Schedule D, filed June 14, 2004. UDC's proof of claim estimates a claim of $3,265,101.70 in interest arrears. *See* UDC's Exhibits 10 and 11. Debtors also list UDC with a secured claim of $9,614,440.91 in connection with "consolidated mortgages" on Kennedy Plaza, which Debtors identify as "disputed." *See* Schedule D. UDC's proof of claim, filed on September 30, 2004, estimates a claim of

---

[7] Although SSH had requested that the case be transferred to New York, rather than having the case dismissed, that relief was denied by the Florida bankruptcy court. On appeal the Florida district court affirmed, pointing out that it would be inappropriate to transfer a case that had been found to have been filed in bad faith. *See State Street Houses*, 305 B.R. at 743.

[8] White acknowledged that had the $2,173,809 in Settlement Proceeds been applied to the debt service, all arrearages owed by the Debtors would have been eliminated. *See* May 12th Tr. at 39.

7

$9,612,532.48 in principal being owed.[9] *See* UDC's Exhibits 10 and 11. According to the Debtors' schedules, HUD holds an unsecured claim of $2,543,357, labeled as "contingent" and "disputed." *See* Schedule F, filed June 14, 2004. The parties have agreed that the market value of Kennedy Plaza is $7,135,000 pursuant to an appraisal performed by GAR Associates, Inc., dated July 6, 2004. *See* UDC's Exhibit 13.

After obtaining several extensions of the exclusivity period for filing a chapter 11 plan and disclosure statement, the Debtors filed both on May 27, 2005. *See* UDC's Exhibit 32 and Debtors' Exhibit I. According to the Disclosure Statement, the Plan proposes the continued operation of Kennedy Plaza while pursuing the litigation currently pending in the Bankruptcy Court (Adv. Pro. 04-80217) and in Florida State Court (collectively, the "UDC Litigation").

The litigation pending in this Court seeks the immediate turnover of $2,173,809, currently held by UDC following the Sarabond Settlement. The Debtors also seek an accounting of the balance of the "Settlement Proceeds" in the amount of $7,056,000. The litigation pending in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County Florida (Florida State Court) seeks recovery of monies allegedly owed by the UDC to the Debtors pursuant to Florida Statute, § 772.11 ("Civil Theft Action").[10] According to the Debtors' Disclosure

---

[9] According to the proof of claim filed on behalf of UDC, the total arrearages of principal and interest at the time the cases were filed totaled $4,541,228.04. *See* UDC's Exhibits 10 and 11.

[10] Florida Statute § 772.11 provides that "[a]ny person who proves by clear and convincing evidence that he or she has been injured in any fashion by reason of any violation of §§ 812.012-812.037 . . . has a cause of action for threefold the actual damages sustained . . . ." Florida Statute § 812.014 states that "[a] person commits theft if he or she knowingly obtains or uses, or endeavors to obtain or use, the property of another with intent to, either temporarily or permanently; (a) [d]eprive the other person of a right to the property or a benefit from the property. (b) Appropriate the property to his or her own use or to the use of any person not

8

Statement, the City of Utica, which is described as holding a statutory lien against the Debtors

for prepetition water and sewer charges in the approximate amount of $30,000, "will be paid in

full with interest upon completion of the UDC Litigation and/or the decoupling and refinancing

of the Project." *See* Debtors' Disclosure Statement (UDC's Exhibit 32) at 13.  The same

provision is made for paying general unsecured claims, which are estimated to total

approximately $3,533,765.44.  *Id.*  With respect to the claim of the UDC, the Debtors indicate

in their Disclosure Statement that

> [i]n the event the Debtors are successful in the UDC Litigation
> and/or the pending rent increase application, the Debtors
> anticipate that they will be able to make the requisite debt service
> payments to satisfy the UDC claim as determined in accordance
> with the UDC Litigation or the claim shall be paid at the time the
> Project is decoupled and refinanced.  The decoupled interest
> reduction payment will support a new mortgage in excess of
> $6,000,000.00.

*Id.*

According to Horwitz, the Debtors hope to be able to reduce, if not eradicate, the UDC

secured debt by means of the UDC Litigation.  *See* Horwitz Deposition  at 137 and June 2nd Tr.

at 13.[11]  Horwitz testified at his deposition that he estimated that it would take approximately 24

months to complete the litigation in Florida.  *Id.* at 167. It was his testimony that the Debtors are

in the process of having special counsel appointed to reactivate and prosecute the Florida Civil

---

entitled to the use of the property."

    [11] Debtors objected to the use of the Horwitz Deposition, dated May 4, 2005, and
identified as UDC's Exhibit 31.  *See* Debtors' Objection, dated May 18, 2005.  The Court has
reviewed those objections and notes that the statements, on which it has relied and referenced in
this decision were not objectionable to the Debtors.  Therefore, the Court need not address any
of the objections noted by the Debtors.

9

Theft Action,[12] which was halted upon the filing of a "Suggestion of Bankruptcy" in September 2004. *See* June 2nd Tr. at 14. He estimated that damages in the Civil Theft Action could run in the range of $12 million, calculated by combining the $2,173,809 in Settlement Proceeds originally earmarked for HUD, plus an interest calculation, times three. *Id.* at 21. At the time that the litigation was halted, UDC had filed a motion to dismiss the action.[13] *See* UDC's Exhibit 33-A.

According to Horwitz, the Debtors' Plan depends on the outcome of both lawsuits, particularly the turnover proceeding pending in this Court. *See* June 2nd Tr. at 26. He explained that if successful in the adversary proceeding, there would be a reduction in any damage award in the Florida Civil Theft Action. *Id.* at 20. He also testified that if successful in the Florida Civil Theft Action, the Debtors would be entitled to a treble award of damages. *See id.*

The Debtors' Plan also contemplates receiving a rent increase from the Division of Housing and Community Renewal ("DCHR"). *Id.* at 12. Horwitz testified that the last rent increase occurred in 1991. He also acknowledged that it is a very long process to complete. *Id.* at 17. Indeed, he indicated that they are reviewing a budget rent determination prepared by Conn & Co., P.C., accountants in Atlanta, for submission to the DHCR for the years 2006 and 2007. *Id.* at 25.

---

[12] On August 18, 2005, the Debtors filed a motion seeking the appointment of Horwitz and the law firm of Searcy Denney Scarola Barnhart & Shipley, P.A. as co-special counsel in connection with the Civil Theft Claim." The motion is currently scheduled to be heard on November 1, 2005.

[13] Although the Debtors had not had an opportunity to respond to UDC's motion, they provided the Court with a copy of a draft response. *See* Attachment to Debtors' Post-Hearing Mem. of Law, filed July 20, 2005.

Finally, Horwitz testified that the Debtors are proposing to obtain $6 million in refinancing, but that in order to do that, it must reduce UDC's claim below $6 million. This would require resolution of the UDC litigation in favor of the Debtors and a reduction or elimination of the debt owed to UDC. *Id.* at 89-91. Only then would they be in a position to "decouple" the interest reduction payment from the underlying debt and obtain new financing.[14] *See id.* at 122 and Horwitz Deposition at 137. Horwitz acknowledged that unless the Debtors were able to pay off the UDC debt, they would need the consent of UDC to decouple.

With respect to how long the "decoupling" process might take, White testified that "[a] project that's current on its payments typically takes a year. A distressed project such as this one will take longer." June 2nd Tr. at 134. Furthermore, White testified that based on his experience with several decouplings, he did not believe the Debtors would be able to decouple without first rehabilitating Kennedy Plaza. *Id.* at 136. M. Scott Allen ("Allen"), who had performed the appraisal on Kennedy Plaza for GAR Associates, testified that the "as is" value he placed on Kennedy Plaza at $7,135,000 was as of the date of his inspection on July 6, 2004 and represented the price a developer would be willing to pay for the property based on the ability ultimately to decouple the project, which would require that renovations first take place. *See* May 12th Tr. at 70 and 72.

---

[14] Horwitz explained that "the underlying interest reduction payment is separated from or decoupled from the debt and is used to support new financing in exchange for an agreement that the property will still be used for a period of time to provide affordable housing under the aegis of an agency such as DHCR." Horwitz Deposition at 138.

## ARGUMENTS

Pursuant to Code § 362(d)(1), UDC contends that cause exists to lift the automatic stay because (a) the Debtors have acted in bad faith in commencing the bankruptcy case and (b) UDC's interests are not adequately protected.  In response to the latter argument, the Debtors direct the Court's attention to the fact that UDC is receiving monthly payments of approximately $45,000 from HUD, which provides UDC with adequate protection.  However, it is UDC's position that while it has been receiving monthly payments from HUD, the Debtors' cash flow is insufficient to make either the balance of the monthly payments to UDC of approximately $15,000 or the payments in lieu of taxes to the City of Utica.  In this regard, UDC directs the Court's attention to the fact that according to the operating reports of the Debtors for May 2005, the Debtors had $50,699.07 in cash on hand and $37,202.61 in accounts payable and, on an accrual basis, had lost $237,319.95 year-to-date.  *See* Docket No. 241.  In addition, UDC  points out that there is no equity cushion, and no payments of principal have been made by the Debtors over the last thirty years.  In addition, UDC contends that the Debtors have made little or no capital improvements to Kennedy Plaza.

UDC contends that there also is a basis for granting relief from the automatic stay pursuant to Code § 362(d)(2).  Neither party disputes the Debtors' lack of equity in Kennedy Plaza.  With respect to whether the property is necessary for the Debtors' reorganization, UDC relies on the Supreme Court's decision in *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 808 F.2d 363 (5th Cir. 1987), *rev'd*, 484 U.S. 365 (1988) in which the Supreme Court held that it is a debtor's burden to establish that the property in question is "essential for

12

an effective reorganization *that is in prospect.*" *Id.* at 376 (emphasis in original). In other words,

"there must be 'a reasonable possibility of a successful reorganization within a reasonable time.'"

*Id.,* quoting the en banc court in the case, 808 F.2d at 370-71, and nn.12-13.

In response, the Debtors contend that "[i]n determining if there exists a 'reasonable

possibility' of reorganization, the debtor need not prove that the proposed plan is confirmable,

that is, acceptable to its creditors." *In re White Plains Development Corp.*, 140 B.R. 948, 951

(Bankr. S.D.N.Y. 1992). It is the Debtors' position that given the fact that UDC/MLC failed to

use the Settlement Proceeds "for the purpose for which [they were] assigned, there is a high

likelihood that the Debtors will prevail on their turnover claim . . . ." Debtors Memorandum of

Law at 16. This position, according to the Debtors, is given additional weight by what the

Debtors deem the "clear evidence that HUD has no interest in the money retained by UDC/MLC"

based on HUD's proof of claim which asserts an unsecured claim.[15]

## DISCUSSION

Whether to grant relief from the automatic stay is a matter of the Court's discretion. *See*

*Sonnax Industries, Inc. v. Tri Component Products Corp. (In re Sonnax Industries, Inc.)*, 907

F.2d 1280, 1286 (2d Cir. 1990). UDC has the initial burden pursuant to Code § 362(d)(1) to

make an initial showing of "cause." *Id.* at 1281. In this case, UDC asserts that the Debtors'

petitions were filed in bad faith and that it is not adequately protected.

---

[15] On October 4, 2005, HUD filed its answer to the Debtors' complaint filed against UDC
in this Court and asserted a counterclaim requesting that the Court direct UDC to turn over the
Settlement Proceeds to HUD.

The concept of "bad faith" does not lend itself to precise definition.  It is for the Court to consider any factors which evidence "an intent to abuse the judicial process and the purposes of the reorganization provisions or, in particular, factors which evidence that the petition was filed to delay or frustrate the legitimate efforts of . . . creditors to enforce their rights."  *In re Albany Partners, Ltd.*, 749 F.2d 670, 672 (11th Cir. 1984) (examining the issue of bad faith in the context of a motion to dismiss the case).

The standards for dismissing a bankruptcy case on the basis of bad faith "are not substantively different" from those applied in the context of a motion seeking relief from the automatic stay.  *See In re 234-6 West 22d St. Corp.*, 214 B.R. 751, 757 (Bankr. S.D.N.Y. 1997).  As noted in *234-6 West 22d St.*,

> when faced with a motion to lift the stay on bad faith grounds, a judge must conduct a careful analysis similar to that performed with a motion to dismiss a case on bad faith grounds.  In both cases, the relief sought is an extraordinary remedy that requires careful examination of the facts on a case-by-case basis.  But where the circumstances require such relief, and the cases granting both types of motions are legion, a judge must not shrink from ordering it.

*Id.*  To this end, the courts have considered a variety of factors:

(1)     the debtor has only one asset;

(2)     the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;

(3)     the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;

(4)     the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;

(5)     the timing of the debtor's filing evidences an intent to delay or frustrate the

legitimate efforts of the debtor's secured creditors to enforce their rights;

(6)    the debtor has little or no cash flow;

(7)    the debtor can't meet current expenses including the payment of personal property
and real estate taxes; and

(8)    the debtor has no employees.

*In re C-TC 9th Ave. Partnership,* 113 F.3d 1304, 1311 (2d Cir. 1997) (citing *Pleasant Pointe*

*Apartments, Ltd. v. Kentucky Housing Corp.*, 139 B.R. 828, 832 (Bankr. W.D. Ky. 1992)).

Accordingly, the Court considers these factors in examining the motion before it:

(1)    <u>Debtors have only one asset:</u>  The Debtors' only asset in this case is Kennedy Plaza, and

the rents generated from it.

(2)    <u>Debtors have few unsecured creditors:</u>  According to the Debtors' schedules, the claims

of approximately sixty unsecured creditors total approximately $3,533,765.44, of which the

Debtors identify HUD as holding a contingent, disputed unsecured claim of $2,543,357.  The

Debtors also list a disputed unsecured claim of $606,323 of the City of Utica pursuant to Article

2 of the New York Private Housing Law.  In addition, there is a claim of $34,000 of Horwitz for

legal services. Without the HUD claim, the City of Utica's claim, and Horwitz's claim, the

Debtors' unsecured debt is reduced to $350,085.44 at the time they filed their petitions.  This is

to be compared with the claims of UDC of approximately $12.9 million.

(3)    <u>Debtors' one asset is the subject of a foreclosure action:</u>  Kennedy Plaza, the Debtors'

only significant asset, was the subject of a foreclosure action at the time that they commenced

their cases.

(4)    <u>Debtors' financial condition is, in essence, a two party dispute which can be resolved in</u>

<u>the pending state foreclosure action:</u>  The Florida bankruptcy court in SSH's case took the

position that the financial problems for SSH involved a two party dispute that could be resolved in a New York State foreclosure action. *See State Street Houses*, 305 B.R. at 736-37. The action pending in this Court seeks the immediate turnover of $2,173,809, currently held by UDC following the Sarabond Settlement, as well as an accounting of the balance of the "Settlement Proceeds" in the amount of $7,056,000. This Court makes no finding concerning whether the New York State Court would consider such relief in the context of the pending foreclosure action. However, the Debtors point out that the civil theft action arises under Florida state law and that there is no similar statute in New York.

(5)      Timing of the Debtors' filing evidences an intent to delay efforts of their secured creditors to enforce their rights: Horwitz admitted that the timing of the filing of the Debtors' cases was intended to prevent the appointment of a State Court receiver to manage Kennedy Plaza.

(6)      Debtors have little or no cash flow: Horwitz testified that the occupancy rate for Kennedy Plaza averaged 95% from which rental income is generated. *See* June 2nd Tr. at 13. However, as Horwitz acknowledged, the rates of rent have not been increased since 1991 and place a severe strain on the Debtors' cash flow. Nonetheless, it is clear from a review of the operating reports filed on behalf of the Debtors that there is rental income of between $90,000 and $100,000 per month being generated on an accrual basis. *See, e.g.*, UDC's Exhibit 29.

(7)      Debtors can't meet current expenses: The Debtors' operating report for April 2005 indicates that the Debtors had $83,104.05 in cash on hand as of April 1, 2005, and that $86,077.61 in rents had been received, as well as other receipts totaling $5,601.50. Thus, the Debtors had on hand $174,783.16 in available funds in April 2005. Disbursements for the month totaled $123,977.82, leaving cash on hand at the end of the month of $50,805.28. However, the

disbursements did not include any payments to secured creditors, including UDC.  Nor is there

any payment of real property taxes.  Horwitz testified that the Debtors are required to make

payments in lieu of taxes, but that they were not due until July or August 2005.[16]  *See* June 2nd

Tr. at 83.

(8)    <u>Debtors have no employees:</u>  SSH has no employees.  Horwitz testified that SSA has five

or six employees.[17]  *See id.* at 31.

These same factors were considered by the Florida bankruptcy court.  *See State Street

Houses,* 305 B.R. at 734-37.  However, in that case SSH was the only debtor.  SSH was found

to be merely a "corporate shell" which was not a going concern and had no employees.  *See id.*

at 736.  In addition, the Florida bankruptcy court found that the fact that the case had been

commenced "over a thousand miles from Kennedy Plaza, the Movants, and other creditors,

including HUD and the City of Utica, is additional evidence that the Chapter 11 proceeding was

commenced in bad faith."  *Id.* at 737.

In the matter *sub judice*, there are two debtors, one of which does have a few employees

and does have an ongoing business from which regular monthly income is generated.  Based on

a review of the Debtors' operating reports, it appears that they have been able to meet their

current expenses, including the payments in lieu of taxes, with the exception of the monthly

payments of $15,000 due to UDC.  Furthermore, the filing is in the district in which its main

asset, Kennedy Plaza, is located.  It is also the district in which many of its creditors have offices.

---

[16]  According to the operating report of the Debtors filed for July 2005 (Docket No. 295),
$45,262.91 in taxes was paid to the City of Utica.

[17]According to the Debtors' Disclosure Statement, they employ nine full-time employees
and three part-time employees.  *See* MLC/UDC Exhibit 32 at 8.

The number of claims of unsecured creditors, while their total amounts are dwarfed by those of the UDC, the City of Utica and HUD, nevertheless, are relatively many.

Clearly, the fact that the Debtors' one asset, Kennedy Plaza, is the subject of a foreclosure action and the fact that the Debtors filed their petitions in an effort to delay UDC from enforcing its rights as a secured creditor are factors to be considered in connection with a determination of bad faith. However, the Court notes that the fact that the Debtors filed their petitions to prevent the appointment of a temporary receiver in the foreclosure action commenced by UDC in May 2003 in and of itself does not establish bad faith or "cause" for relief from the automatic stay. *See In re Syndicom Corp.*, 268 B.R. 26, 47 (Bankr. S.D.N.Y. 2001). In balancing all of the other factors, the Court concludes that the petitions were not filed in bad faith. Furthermore, because UDC is receiving monthly payments from HUD of approximately $45,000, its interests in Kennedy Plaza are adequately protected despite its undersecured status. Accordingly, the Court will deny the relief sought by UDC pursuant to Code § 362(d)(1) for "cause."

Therefore, the Court must also consider the arguments made by UDC pursuant to Code § 362(d)(2). The parties do not dispute that there is no equity in Kennedy Plaza. The threshold determination for the Court is whether there is a realistic prospect of an effective reorganization within a reasonable period of time. As noted previously, the Debtors have the burden of proof on this issue.

As one court has noted,

> [a] moving target burden of proof requires that the debtor must provide the most stringent and convincing showing under § 362(d)(2)(B) after the expiration of the exclusivity periods to file a plan and obtain acceptance thereof. The evidence presented by the debtor must be greater than "plausible" or "probable". After the expiration of the exclusivity period or periods, to satisfy §

> 362(d)(2)(B), the debtor must offer sufficient evidence to indicate that a successful reorganization within a reasonable time is "assured".
>
> * * * *
>
> Generally, it is impossible to satisfy § 362(d)(2)(B) if: (1) the only evidence offered is debtor's chimerical opinion that it can successfully reorganize; or (2) the evidence offered indicates the debtor is unable to propose a meaningful plan.

*In re Holly's, Inc.*, 140 B.R. 643, 702-703 (Bankr. W.D. Mich. 1992).

In this case, the Debtors have filed their plan and disclosure statement. In their treatment of creditors, the Debtors indicate that UDC, listed as Class 1, will continue to receive the monthly interest reduction subsidy payment from HUD. In addition, the Debtors indicate in the First Amended Disclosure Statement, dated September 28, 2005, that

> [i]n the event the Debtors are successful in the UDC Litigation and/or the pending rent increase application, the Debtors anticipate that they shall be able to make the requisite debt service payments to satisfy the UDC claim as determined in accordance with the UDC Litigation or the claim shall be paid at the time the Project is decoupled and refinanced.

UDC's Exhibit 32 at 13. In addition, Class 3, which is comprised of the secured claim of the City of Utica, and Class 6, which is comprised of general unsecured creditors with allowed claims, are both to be paid in full "upon completion of the UDC Litigation and/or the decoupling and refinancing of the Project. *Id.*

The success of the Debtors' reorganization rests on four factors over which the Debtors have little control insofar as their outcome is concerned. First of all, they are in the process of seeking an increase in rental rates for Kennedy Plaza. Horwitz acknowledged that this is a lengthy process.

Second, the Debtors commenced an adversary proceeding in this Court on August 6,

2004, seeking turnover of the $2,173,809 which had previously been assigned to UDC by the Debtors in connection with the Sarabond Settlement.  The Court denied a motion by UDC seeking dismissal of the complaint on March 23, 2005.  *See State Street Associates, L.P. v. New York State Urban Development Corp.*, 323 B.R. 544 (Bankr. N.D.N.Y. 2005).[18]  Most recently the Court allowed HUD to be joined as a party and approved a stipulation allowing HUD until October 4, 2005, to file its answer.  On October 4, 2005, HUD filed its answer to the complaint and asserted a counterclaim requesting that the Court direct UDC to turn over the Settlement Proceeds to HUD (Docket No. 62).  To date, no trial has been scheduled.

Third, the Debtors intend to pursue the Civil Theft Action in Florida State Court. Horowitz admitted that this litigation was likely to take two years to complete.  As pointed out by the UDC in its motion to dismiss that action, which was stayed upon the filing of the bankruptcy petitions, the Debtors have to overcome the problem of the Florida State Court's jurisdiction over the UDC, which asserts that it is not a resident of the State of Florida and has not engaged in any conduct in the State of Florida whereby it could reasonably expect to be "haled into court" in Florida.  It is UDC's position that the parties thirty year lending relationship "involved solely New York corporations, solely New York real property, litigation conducted solely in New York, settlement proceeds from that litigation which were always held in New York, and documents governed by New York law."  UDC's Post-Trial Mem. of Law at 28.  SSH allegedly has asserted that personal jurisdiction over the defendants exists based on Florida

---

[18] In its decision, the Court denied UDC's motion to dismiss the first and second causes of action of the complaint, seeking turnover of the Settlement Proceeds and an accounting, respectively, based on a finding that there was "a triable issue of fact as to whether UDC fraudulently induced the Debtors into signing the Amended LRA based upon the Debtors' belief that UDC would repay HUD immediately."  *Id.* at 560.

Statute § 48.193(1)(b), "which confers personal jurisdiction over parties that commit a 'tortious act' in Florida" even if they were not physically present in Florida when the act occurred.  *See Wendt v. Horowitz*, 822 So.2d 1252, 1257 (Fla. 2002).  A threshold question will be whether the allegations in SSH's complaint state a cause of action establishing that the defendants committed a tortious act in Florida such that the Florida court has personal jurisdiction over them.  In addition, UDC argues that even if SSH is able to establish personal jurisdiction and that Florida law applies, SSH will be unable to recover treble damages because of the contractual relationship which exists between the parties.  UDC's Post-Trial Mem. of Law at 29 and 31, citing to *Rosenthal Toyota, Inc. v. Thorpe,* 824 F.2d 897, 902 (11th Cir. 1987) (indicating that "[u]nder Florida law, damages for civil theft can only be trebled where there is no contractual relationship between the parties").

Finally, the Debtors' plan of reorganization contemplates being able to take advantage of "decoupling" procedures, which allow the housing project to be refinanced while the interest reduction payments are "decoupled" from the original debt and allowed to continue.  Horwitz acknowledged that unless the Debtor was able to eliminate the claim of UDC, it would be necessary to obtain UDC's consent to any proposed decoupling.  Furthermore, White testified that the process of decoupling could take more than a year and, in all likelihood, the Debtors would be required to make extensive renovations to Kennedy Plaza before any decoupling would be permitted.

The key concern of the Court is the delay inherent in the Debtors' plan of reorganization, coupled with the uncertainty of its success with any of the four factors identified above.  Obviously, if the Court were to grant the relief requested by UDC, it is a certainty that the

unsecured creditors will receive nothing.  The same will be true should the Debtors be unsuccessful with the UDC Litigation under the terms of the plan, which provides that payment of the secured claim of the City of Utica, as well as general unsecured claims, is contingent on the outcome of the litigation in this Court and in the Florida State Court.

UDC first loaned the Debtors over $8 million to construct Kennedy Plaza in 1971.  Over the years, it has provided additional funds in connection with the housing project.  The parties subsequently agreed to a forbearance period for the Debtors, which extended until July 31, 2000. UDC has not received any payment on principal for over thirty years, and the Debtors have made no payments on the obligation since 1998.  Admittedly, UDC has been receiving the monthly interest payments of approximately $45,000 from HUD.  However, the Debtors are now proposing further delay for UDC while its claim continues to increase at an estimated rate of $286,500 in unpaid interest annually.  Based on the testimony presented, it would appear that this delay is likely to last at least a year and perhaps even for two years or more while the request for a rental increase is considered and the UDC Litigation is resolved.  It is also possible that payment to the UDC will have to await decoupling and refinancing.

The Court recognizes that

> a lift stay hearing should not be transformed into a confirmation hearing.  The "effective reorganization" requirement enunciated by the Supreme Court does, however, require a showing by a debtor and a determination by the bankruptcy court that a proposed or contemplated plan is not patently unconfirmable and has a realistic chance of being confirmed.

*In re 266 Washington Associates*, 141 B.R. 275, 281 (Bankr. E.D.N.Y.), *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992); *see also In re 499 W. Warren Street Associates*, 151 B.R. 307, 310 (Bankr. N.D.N.Y. 1992) (noting that "where a debtor submits a proposed plan before the lift stay hearing

. . . *Timbers* requires a determination that such plan is not 'patently unconfirmable.'" (citations omitted)).  The Debtors' plan provides for payment of its ongoing expenses.  However, in order to reorganize and to pay its debt to the UDC and to its unsecured creditors, it is asking that the creditors rely on what can only be called "pie in the sky" in the view of this Court.  As noted by the court in *In re Yeager*, No. 02-35857, 2004 WL 422049 (Bankr. E.D.Pa. Feb. 18, 2004), in the context of a chapter 13 case, "[a] plan dependent on an uncertain litigation outcome cannot be confirmed because it simply is not feasible . . . . Although a plan dependent for its success on a contingent source of income such as a litigation recovery . . . is not per se defective, a plan proposed  after multiple bankruptcy filings over a period of years must have a higher degree of certainty than the one proposed here."  *Id.* at *3.  In the view of this Court, the same rationale is applicable in a chapter 11 case such as the one now before it.

In addition, the Court notes the difficulty confronting the Debtors in obtaining the necessary affirmative vote of the class of unsecured creditors.   Code § 1126(c) requires acceptance by creditors "that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . that have accepted or rejected such plan." 11 U.S.C. § 1126(c).  In this case, the Debtors have identified unsecured claims of $3.533 million, exclusive of UDC's deficiency claim of $5.742 million, based on a fair market value for Kennedy Plaza of $7.135 million and a total claim of $12.877 million.  Combining the two, namely $3.533 million and $5.742 million, unsecured debt totals approximately $9.275 million.  At 62% of Class 6, UDC controls the class for acceptance purposes and has indicated that it will not accept the proposed treatment.  The Court's preference is always to afford a debtor an opportunity to reorganize.  However, in the opinion of this Court, the Debtors have not met their

23

burden of establishing that their reorganization is in prospect and that there is a reasonable possibility of success within a reasonable time.  All that is a "certainty" are the monthly payments by HUD, which have not required any affirmative action on the part of the Debtors in their efforts to reorganize.  The Court would be more inclined to find that there was a reasonable possibility of success had the Debtors already obtained a rent increase or been able to obtain refinancing without the need for decoupling.  However, under the present circumstances, the Court concludes that it must grant the motion of UDC pursuant to Code § 362(d)(2).

It is hereby

ORDERED that the motion of UDC requesting relief from the automatic stay pursuant to Code § 362(d)(1) is denied; and it is further

ORDERED that the motion of UDC requesting relief from the automatic stay pursuant to Code § 362(d)(2) is granted.

Dated at Utica, New York

this 27th day of October 2005

/s/ Stephen D.  Gerling
STEPHEN D.  GERLING
Chief U.S. Bankruptcy Judge