UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
---------------------------------------------------------
IN RE:

    STATE STREET ASSOCIATES, L.P.        CASE NO. 04-63673
                                    Jointly Administered
                     Debtor        Chapter 11
---------------------------------------------------------
IN RE:

    STATE STREET HOUSES, INC.        CASE NO. 04-63672

                     Debtor        Chapter 11
---------------------------------------------------------
APPEARANCES:


GUY A. VAN BAALEN, ESQ.
Assistant U.S. Trustee
10 Broad Street
Utica, New York 13501

NIXON PEABODY LLP                WILLIAM THOMAS, ESQ.
Attorneys for New York State Mortgage Loan    GREGORY MASCITTI, ESQ.
  Enforcement and Administration Corp.,      Of Counsel
  New York State Urban Development Corp.,
  New York State Project Finance Agency
1300 Clinton Square
Rochester, NY 14603

RAICHLE, BANNING WEISS, PLLC      ARNOLD WEISS, ESQ.
Attorneys for Debtors
410 Main Street
Buffalo, NY 13202

HISCOCK & BARCLAY             SUSAN R. KATZOFF, ESQ.
Attorneys for Niagara Mohawk        Of Counsel
One Park Place
300 South State Street
P.O. Box 4878
Syracuse, New York 1321-4878

WILLIAM F. LARKIN, ESQ.
Attorney for U.S. Dept. of Housing and
  Urban Development
U.S. Attorney's Office
P.O. Box 7198
100 S. Clinton St.
Syracuse, New York 13261-7198


Hon. Stephen D. Gerling, Chief U.S. Bankruptcy Judge


**MEMORANDUM-DECISION, FINDINGS OF FACT,
CONCLUSIONS OF LAW AND ORDER**


Under consideration by the Court is a motion, filed on January 31, 2006, by the United

States Trustee ("UST"), seeking conversion of the chapter 11 cases of State Street Associates,

L.P. ("SSA") and State Street Houses, Inc. ("SSH") (collectively the "Debtors") pursuant to §

1112(b) of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330 ("Code").  On February

10, 2006, a motion to convert the Debtors' cases was also filed on behalf of the New York State

Mortgage Loan Enforcement and Administration Corporation ("MLC").[1] MLC also joined in the

motion filed by the UST.  Opposition to both motions was filed on behalf of the Debtors on

February 22, 2006 and February 23, 2006, respectively (Docket Nos. 388 and 390).  On February

24, 2006, an affidavit of Assistant Commissioner Richmond McCurnin ("McCurnin Affidavit")

was filed on behalf of the New York State Division of Housing and Community Renewal

("DHCR") in support of both motions.  The Debtors' filed opposition to the joinder of DHCR on

February 27, 2006 (Docket No. 400).

Both motions were heard by the Court on February 28, 2006, at the Court's regular motion

---

[1]  According to MLC, it is an agent and attorney-in-fact for the New York State Urban
Development Corporation ("UDC"), doing business as Empire State Development Corporation
("ESDC") and New York State Project Finance Agency ("PFA").

term in Utica, New York.  Following oral argument, the Court scheduled the motions for an evidentiary hearing commencing on April 5, 2006.  The evidentiary hearing was continued to April 6, 2006, for further testimony.  At the close of the evidentiary hearing, the Court afforded the parties an opportunity to file memoranda of law.  The matter was taken under submission on May 5, 2006.

## JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and subject matter of this contested matter pursuant to 28 U.S.C. §§ 1334, 157(a), (b)(1) and (b)(2)(A) and (O).

## FACTS

The Court will assume familiarity with its prior Memorandum-Decision, issued on October 27, 2005 ("October 2005 Decision") following evidentiary hearings conducted on May 12, 2005 and June 2, 2005 concerning MLC/UDC's request for relief from the automatic stay pursuant to Code § 362(d).  On April 6, 2006, MLC/UDC filed a "Designation of Transcripts, Orders and Deposition regarding Motion to Convert by New York State Mortgage Loan Enforcement and Administration Corporation as Agent and Attorney-in-Fact for New York State Urban Development Corporation and New York State Project Finance Agency" ("Designation") (Docket No. 466), which the Court received in connection with the motions herein with the proviso that Debtors' counsel be afforded an opportunity to designate any additional contents of

the record in the case which he might wish to have considered as well.[2] *See* MLC/UDC's Exhibit

18.

The Designation includes references to the deposition conducted on May 4, 2005, of

Lanny Horwitz, ("Horwitz"), the sole shareholder and president of SSH and Mathematical Bridge

Corp., as well as the sole director of both corporations.  Horwitz is one of five employees of

Mathematical Bridge Corp. and is the only one residing in Florida.  In addition, the Designation

references transcripts from evidentiary hearings held on May 12, 2005 and June 2, 2005 ("May

12th Tr." and "June 2nd Tr.", respectively) (Docket Nos. 233 and 240) concerning the motion

filed on behalf of MLC/UDC seeking relief from the automatic stay pursuant to Code § 362(d),

for which the Court issued its October 25, 2005 Decision.  Finally, the Designation includes

citations to the transcript of a hearing held on March 3, 2006 ("March 3rd Tr.") (Docket No. 431),

with respect to the Debtors' motion for the continued use of cash collateral, filed on February 23,

2006.

In addition, as noted previously, the Court heard testimony from, *inter alia,* Horwitz and

McCurnin, on April 5, 2006 and April 6, 2006 ("April 5th Tr." and "April 6th Tr.", respectively)

(Docket Nos. 471 and 472).

<u>Parties</u>

SSH is a limited-profit housing company, incorporated pursuant to the Article 2 of the

New York Private Housing Finance Law,"[3] which holds legal title to Kennedy Plaza Apartments

---

[2]  According to the docket in the cases, the Debtors have not submitted any additional
designations of the record in the case for the Court to review.

[3]  At the hearing conducted on April 6, 2006, as well as in its memorandum of law, filed
on May 5, 2006 (Docket No. 502), Debtors' counsel argued that pursuant to Code § 1112(c), the

("Kennedy Plaza"), a 303 unit subsidized rental apartment complex located in Utica, New York.

SSA is a New York limited partnership and owner of the equitable interest in Kennedy Plaza.

Mathematical Bridge Corporation is a New York corporation and the managing general partner

of SSA.  Mathematical Bridge Corp. provides accounting, tax and legal services to SSA and

manages Kennedy Plaza.  Horwitz is the sole shareholder and president of SSH and Mathematical

Bridge Corp., as well as the sole director of both corporations.

On July 21, 1971, SSH borrowed $8,105,000 from UDC to construct and operate Kennedy

Plaza.  According to the Debtors' schedules, UDC holds a secured claim for accrued interest of

$2,947,247.24, which Debtors identify as "disputed."  UDC's proof of claim estimates a claim

of $3,265,101.70 in interest arrears. Debtors also list UDC with a secured claim of $9,614,440.91

in connection with "consolidated mortgages" on Kennedy Plaza, which Debtors identify as

"disputed."   In this regard, the Debtors have asserted a right of setoff in certain adversary

proceedings filed in these cases.  UDC's proof of claim, filed on September 30, 2004, estimates

a claim of $9,612,532.48 in principal being owed.[4] According to the Debtors' schedules, the

Department of Housing and Urban Development ("HUD") holds an unsecured claim of

$2,543,357, labeled as "contingent" and "disputed."   The parties have agreed that the market

---

Court could not convert the cases without their consent.  Debtors' counsel asserted that the
Debtors are not monied businesses and are subject to the regulations and approval of DHCR for
any equity return on investment.  At the hearing, the Court ruled that the Debtors, in particular
SSH, was not an "eleemosynary institution" as discussed by Congress in enacting that particular
section.  Given the fact that it was incorporated as a "limited profit housing company," the Court
found that it was a "moneyed, business, or commercial corporation" to which Code § 1112(c) did
not apply.

[4] According to the proof of claim filed on behalf of UDC, the total arrearages of principal
and interest at the time the cases were filed totaled $4,541,228.04.

6

value of Kennedy Plaza is $7,135,000 pursuant to an appraisal performed by GAR Associates, Inc., dated July 6, 2004.  Furthermore, the parties do not dispute that there is no equity in Kennedy Plaza.

Under Article 2 of the New York Private Housing Finance Law, DHCR is responsible for supervision of the Debtors in their operation of Kennedy Plaza.  The project is also under the jurisdiction of HUD due to a subsidy under § 236 of the National Housing Act.[5]

Procedural Background

SSH filed a chapter 11 bankruptcy case in the United States Bankruptcy Court for the Southern District of Florida (the "Florida Bankruptcy Court") on July 16, 2002.  On December 3, 2002, the Florida Bankruptcy Court dismissed SSH's case on the grounds that the petition was filed in bad faith.  *See In re State Street Houses, Inc.*, 305 B.R. 726 (Bankr. S.D. Fla. 2002), *aff'd* 305 B.R. 738 (S.D. Fla. 2003), *aff'd* 356 F.3d 1345 (11th Cir. Jan. 15, 2004).  The Debtors filed chapter 11 petitions with this Court on May 21, 2004, in response to a decision on May 20, 2004 of the New York Supreme Court, Oneida County ("State Court"), to appoint a receiver in UDC's pending foreclosure action.[6]

In its October 2005 Decision, the Court granted MLC/UDC's motion seeking relief from the automatic stay pursuant to Code § 362(d)(2) and allowed MLC/UDC to continue with its

---

[5] A discussion of the facts concerning the Debtors' relationship with HUD may be found in the Court's October 2005 Decision at 3-4 and 5, n.6).

[6] The filing of the Debtors' petitions on May 21, 2004, occurred approximately four months after the U.S. Court of Appeals for the  Eleventh Circuit's decision affirming the dismissal of SSH's bankruptcy case in Florida.

7

foreclosure action in the State Court.[7]  A Notice of Appeal of the October 2005 Decision was

filed by the Debtors on November 3, 2005 (Docket No. 314).  On November 8, 2005, the Debtors

filed a motion, by Order to Show Cause, seeking a stay of the October 2005 Decision pending

appeal.  On December 9, 2005, the Court signed an Order granting a stay for a period of ninety

days from November 29, 2005, the date the Debtors' motion was heard, until February 27, 2006.

The Court indicated that its Order was without prejudice to the right of the Debtors to seek a

further extension of the stay "upon showing of good cause" (Docket No. 346).

On February 10, 2006, the same day on which MLC/UDC filed its motion now under

consideration, the Debtors filed a second motion requesting an order further extending the stay.

The motion was heard on February 28, 2006, and on March 15, 2006, the Court granted the

Debtors a forty-five day extension to April 14, 2006, but indicated that it would not consider any

further requests by the Debtors "absent any extraordinary circumstances beyond the reasonable

control of the Debtors" (Docket No. 435).  On April 12, 2006, the Debtors sought a further

extension, by way of Order to Show Cause.  A hearing was held on April 17, 2006, at which time

the Court agreed to extend the stay until May 12, 2006, the date on which the United States

District Court for the Northern District of New York was to hear the Debtors' appeal of the

October 2005 Decision.  This Court indicated that no further extensions would be granted,

however.  On May 9, 2006, United States District Judge David N. Hurd issued an oral order

denying the Debtors' request for a temporary restraining order against MLC/UDC.  The following

day the Debtors filed a notice in the District Court withdrawing their appeal.  Accordingly, Judge

---

[7] In the October 2005 Decision, the Court concluded that "the Debtors have not met their burden of establishing that their reorganization is in prospect and that there is a reasonable possibility of success within a reasonable time."  October 2005 Decision at 23.

8

Hurd signed an Order on May 11, 2006, dismissing the Debtors' appeal with prejudice (Docket No. 507).

Plan and Disclosure Statement

After obtaining several extensions of the exclusivity period for filing a chapter 11 plan and disclosure statement, the Debtors filed both on May 27, 2005. According to the Disclosure Statement, the Plan proposed the continued operation of Kennedy Plaza while pursuing the litigation pending in the Bankruptcy Court (Adv. Pro. 04-80217) and in a Florida state court. On September 29, 2005, the Debtors filed their Amended Disclosure Statement. At a hearing held on November 1, 2005, Debtors' counsel requested withdrawal of the Plan and Amended Disclosure Statement without prejudice. On March 31, 2006, two months after the UST's motion to convert the case, the Debtors filed their Second Amended Disclosure Statement and Amended Chapter 11 Plan. *See* MLC/UDC's Exhibit 1 and 11.

According to the Debtors' Second Amended Disclosure Statement, the City of Utica, which is described as holding a statutory lien against the Debtors for prepetition water and sewer charges in the approximate amount of $30,000, "will be paid in full with interest upon completion of the 'UDC Litigation' and/or the decoupling and refinancing of the Project." *See* Debtors' Second Amended Disclosure Statement at 18. The same provision is made for paying general unsecured claims consisting of non-insider trade creditors, as well as deficiency claims asserted by holders of claims in Classes One through Five, which the Debtors estimate to amount to approximately $3,533,765.44. *Id.* at 16-17.

The Debtors commenced an adversary proceeding in this Court on August 6, 2004 (Adv. Pro. No. 04-80217), seeking turnover of $2,173,809 ("Settlement Proceeds"), which had

previously been assigned to UDC by the Debtors in connection with the Sarabond Settlement.[8]

The Court denied a motion by UDC seeking dismissal of the complaint on March 23, 2005. *See*

*State Street Associates, L.P. v. New York State Urban Development Corp.*, 323 B.R. 544 (Bankr.

N.D.N.Y. 2005).[9] Most recently the Court allowed HUD to be joined as a party and approved a

stipulation allowing HUD until October 4, 2005, to file its answer.  On October 4, 2005, HUD

filed its answer to the complaint and asserted what was identified as a "counterclaim"[10]

requesting that the Court direct UDC to turn over the Settlement Proceeds to HUD (Docket No.

62).  To date, no trial has been scheduled.

    As set fourth in the October 2005 Decision, the Debtors intend to pursue a Civil Theft

Action in a Florida state court against UDC.  Horowitz previously admitted that this litigation was

likely to take two years to complete.  A threshold question in that action concerns whether the

allegations in SSH's complaint state a cause of action establishing that the defendants committed

a tortious act in Florida such that the Florida court has personal jurisdiction over them.  In

_____

    [8]  A discussion of the facts concerning the Sarabond Settlement and the Settlement
Proceeds may be found in the Court's October 2005 Decision at 4-5.

    [9]  In its decision, the Court denied UDC's motion to dismiss the first and second causes
of action of the complaint, seeking turnover of the Settlement Proceeds and an accounting,
respectively, based on a finding that there was "a triable issue of fact as to whether UDC
fraudulently induced the Debtors into signing the Amended [Loan Restructuring Agreement
("LRA")] based upon the Debtors' belief that UDC would repay HUD immediately." *State Street
Associates, L.P. v. New York State Urban Development Corp.*, 323 B.R. at 560.  Under the terms
of the Amended LRA, UDC provided the Debtors with an additional five year forbearance period
with respect to its mortgage.  In exchange, the Debtors transferred their rights to their Sarabond
Settlement share of $7,056,000 to UDC.  This Court found that "[t]he Amended LRA does not
require UDC to prepay [$2,173,809 of] the Settlement proceeds to HUD in satisfaction of the
HUD Note by a date certain. . . . The payment just had to be their first priority." *Id.* at 559.

    [10]  Because the relief sought requests that UDC be directed to turn over the Settlement
Proceeds to HUD, it is actually a cross-claim between co-defendants.

addition, as discussed in the October 2005 Decision, UDC argued that even if SSH is able to

establish personal jurisdiction and that Florida law applies, SSH would be unable to recover treble

damages because of the contractual relationship which exists between the parties.

Most recently, the Debtors commenced an adversary proceeding against UDC and

DHCR[11] asking that the Court

> exercise its discretionary "related to" jurisdiction to determine Debtors' Florida
> Civil Theft Claim against UDC.[12]  This would obviate the projected two-year
> delay in litigating the claim in Florida which was one of the reasons cited by the
> Court in its [October 2005 Decision).  If successful, these actions . . . could
> eliminate the UDC's secured claim in its entirety.  If only partially successfully
> [sic], it may reduce the UDC's claim from approximately $12,000,000.00 to less
> than $6,000,000.00.  The Debtors believe that they will be able to successfully
> make all required payments under the Plan, including the balance of UDC's claim,
> if any, once that claim has been offset by judgments in the UDC Litigation.

Debtors' Second Amended Disclosure Statement at 12.

With respect to the claim of the UDC, the Debtors indicate in their Second Amended

Disclosure Statement that

> [i]n the event the Debtors are successful in the UDC Litigation and/or the pending
> rent increase application, the Debtors anticipate that they will be able to make the
> requisite debt service payments to satisfy the UDC claim as determined in

---

[11] On December 7, 2005, the Debtors commenced a separate adversary proceeding against
DHCR (Adv. Pro. 05-80290) and on April 1, 2006, just prior to the hearings herein, the Debtors
commenced an adversary proceeding against UDC and DHCR, seeking a declaratory judgment
(Adv. Pro. 06-80108).  *See* MLC/UDC's Exhibit 12.  Both UDC and DHCR filed motions to
dismiss the latter complaint based primarily on the defense of the applicable statute of limitations,
which the Court granted by an Order dated June 19, 2006.

[12] There is an action pending in the Circuit Court of the Seventeenth Judicial Circuit in
and for Broward County Florida (Florida State Court), which seeks recovery of monies allegedly
owed by the UDC to the Debtors pursuant to Florida Statute, § 772.11 ("Civil Theft Action").
At the hearing on June 6, 2006, this Court indicated that it would abstain from hearing the cause
of action asserted in Adversary Proceeding 06-80108 insofar as it sought the same relief in the
Florida State Court.

accordance with the "UDC Litigation" or the claim shall be paid at the time the Project is decoupled and refinanced. The decoupled interest reduction payment will support a new mortgage in excess of $6,000,000.00. Debtors assert the UDC has unclean hands.

*Id.* at 18.

At the evidentiary hearing conducted on April 5, 2006, Horwitz acknowledged that the Debtors have not filed an application to decouple Kennedy Plaza and, unless the Debtors are successful in substantially reducing the debt to UDC, they will require its consent in order to decouple. April 5th Tr. at 28 and June 2nd Tr. at 123. Furthermore, decoupling would require significant renovations to Kennedy Plaza. May 12th Tr. at 70 and 72. Horwitz testified that the Amended Plan contemplates a $7.5 million loan. April 5th Tr. at 31. Horwitz testified that the Debtors have had discussions with the Bank of America about the possibility of financing. *Id.* However, Bank of America would require that it be granted a first lien on Kennedy Plaza, which the Debtors are not in a position to do currently without the consent of UDC. *Id.* at 29.

Pending Litigation

According to the Second Amended Disclosure Statement, "UDC Litigation" is described as being comprised of the adversary proceeding commenced in this Court in 2004 (Adv. Pro. 04-80217) which seeks the immediate turnover of $2,173,809, currently held by UDC following the Sarabond Settlement,[13] and an accounting by UDC of the Debtors' share of the Sarabond Settlement in the amount of $7,056,000 and the adversary proceeding commenced in 2006.

In addition to the "UDC Litigation," on December 7, 2005, the Debtors commenced an

---

[13] Under the terms of an Amended Loan Restructuring Agreement, effective July 31, 1991, the Debtors were granted a period of forbearance until July 31, 2000, on the payment of the debt owed to UDC in exchange for the assignment to UDC of the Settlement Proceeds in connection with the Sarabond Settlement.

action against DHCR.  In the adversary proceeding, the Debtors indicate that they are "seeking to invoke the injunctive power of the bankruptcy court to cause DHCR to implement the 10% rent increase" allegedly approved by DHCR in 2003.  *See* Second Amended Disclosure Statement (MLC/UDC's Exhibit 11) at page 11.  The Debtors acknowledge that DHCR has asserted counterclaims against them, seeking to recover monies expended on legal fees.  *Id.*

Debtors' Relationship with DHCR

McCurnin, Assistant Commissioner of DHCR and supervisor of all state financed projects such as Kennedy Plaza, testified concerning oversight of "Article 2 housing companies."  He explained that DHCR's main concern was to see that the housing companies are run properly, affording safe and affordable housing to their tenants. April 6th Tr. at 9.  He testified that in order to accomplish those goals, the regulations required that the housing companies, such as SSH, submit monthly operating reports and annual reports prepared by a certified public accountant. *Id.* at 11.  Housing companies were required to maintain an escrow and reserve fund ("Operating Escrow Fund" or "OEF") into which they were expected to make monthly deposits to cover insurance, real property taxes, water and sewage fees, as well as escrows and reserves to fund capital improvements.[14] *Id.*  McCurnin also testified that any capital projects in excess of $15,000 required DHCR approval.  In addition, any retainers for legal counsel had to be approved by DHCR.  *Id.* at 12.

McCurnin testified that the Debtors have been in noncompliance with many of the

---

[14]  According to Horwitz, DHCR currently required payments into the OEF of $20,000 -$21,000 per month, which he felt was "impossible" for the Debtors to fund.  April 5th Tr. at 67. McCurnin confirmed that the Debtors' annual requirement for the OEF amounted to $274,800. *See* MLC/UDC's Exhibit 9 and April 6th Tr. at 30-31.  He also testified than in 2004 the Debtors had made no payments into the OEF.  *Id.* at 31.

regulations for at least the past 10-12 years.  *Id.* at 16-17.  According to a letter, dated June 1,

2000, and  written by McCurnin, DHCR has not approved Mathematical Bridge to manage

Kennedy Plaza.  *Id.* at 17.  *See* MLC/UDC's Exhibit 4.  McCurnin testified that the letter

> points out that the housing company has not been funding the operating escrow
> fund, neither the escrows nor the reserves.  It also points out that the loan
> restructuring agreement required certain capital contributions on the part of the
> owners, which we had no evidence of.  It points out that there was no approval by
> the Division for the retention of Mathematical Bridge as the housing company's
> managing agent, nor for the fees that were being charged, nor any of the
> escalations in fees that had occurred over a course of some years.

April 6th Tr. at 22.

According to the Certified Financial Statements of SSA, Mathematical Bridge was paid

for 2001 - $150,144 in management fees (MLC/UDC's Exhibit 6); 2002 - $156,462 in

management fees (MLC/UDC's Exhibit 7); 2003 - $162,720 in management fees (MLC/UDC's

Exhibit 8); 2004 - $112,397 in management fees  (MLC/UDC's Exhibit 9).  McCurnin testified

that Mathematical Bridge was not an approved management company, however.  *See* April 6th

Tr. at 24-31.  McCurnin also testified that DHCR had not approved a retainer for legal services,

including those provided by Horwitz.  *Id.*  In 2004 $85,375 in legal fees were paid by the Debtors,

including $71,000 to Horwitz.[15] *Id.* at 32.  Horwitz testified that he had not charged any legal fees

after May 21, 2004, the date that the Debtors filed their chapter 11 petitions.

Debtors are currently in the process of seeking an increase in rental rates for Kennedy

Plaza of 6% as part of their reorganization.  *See* MLC/UDC's Exhibit 11 at 10-11 and

MLC/UDC's Exhibit 16.  Horwitz acknowledged that this is a lengthy process but testified that

---

[15]  In 2002 legal fees totaling $254,605 were paid by the Debtors, including $158,036 to
Horwitz, and fees totaling $294,539 in 2003, including $113,613 paid to Horwitz.  *See*
MLC/UDC's Exhibits 7 and 8, respectively, and April 6th Tr. at 27 and 29.

if successful in obtaining a 10% rent increase, which Debtors contend was previously approved, he estimated that the Debtors would generate an additional $100,000 per year in income.

McCurnin testified that the last approved rental increase at Kennedy Plaza was in 1990 and actually it was a two stage increase with one increase in 1990 and another in 1991. *Id.* at 33. However, according to McCurnin, Horwitz requested that the 1991 increase be deferred until 1995. *Id.* and MLC/UDC's Exhibit 13.

According to McCurnin, UDC has no involvement in the rent determination process. *Id.* at 15. He explained that a Budget Rent Determination ("BRD") Package must be submitted every two years by the housing company. *Id.* at 13. This includes estimates of income and expenses and if there is a shortfall, the housing company also can submit a formal request for a rent increase, which is to accompany the BRD. *Id.* at 13 and 37. McCurnin testified that to his knowledge between 1992 and 2000 the Debtors had not applied for a rent increase. *Id.* at 34-35.

McCurnin explained that in considering a rent increase, DHCR reviews the monthly operating statements and financial statements and also considers whether the housing company is in compliance with regulations and its previous budget. *Id.* at 13. It also considers the vacancy of the housing project. *Id.* at 14-15. He explained that an increase in rent could result in an increase in vacancies, thereby defeating the attempt to generate additional revenues. *Id.* at 15.

Admitted into evidence on behalf of the Debtors is a copy of an e-mail message sent February 27, 2003, by Jacqueline Dalton, identified as a DHCR employee, stating that she had been informed by Mike Ginsberg[16] that DHCR had approved a 10% rent increase for Kennedy

---

[16] McCurnin testified that Ginsberg had been a housing manager representative within the management bureau of DHCR. He was responsible for conducting field visits, issuing field reports, reviewing contracts and monthly operating statements concerning the Kennedy Plaza.

Plaza. *See* Debtors' Exhibit T. The e-mail goes on to state that the increase required HUD

approval and tenant notification. *Id.* It also discusses legal fees being billed by Horwitz and

charged to the Debtors. With respect to the 2003 rent increase alleged by the Debtors, McCurnin

denied that there had been any such rent increase, indicating that DHCR had not issued an order

to that effect. *Id.* at 41. He explained that while it had identified a shortfall between the income

and expenses at Kennedy Plaza, it had determined that a rent increase was not warranted given

the history of the ownership and the way they had diverted funds for their own purposes to pay

excessive legal fees and other obligations. *Id.* at 41-42.[17] On cross-examination, he explained

that "[a]nytime you have a property where you have almost ten percent --- and in some cases

there's in excess of ten percent of the rent rolls expended on legal fees --- that's a problem." *Id.*

at 75. McCurnin expressed the view that it was the owner's problem, not the housing company's

problem to address such legal fees. *Id.*

Use of Cash Collateral

        Over the course of these cases, the Debtors have sought authorization to use cash

collateral. On February 21, 2006, the Debtors made a request that it be permitted to use cash

collateral beyond February 28, 2006 (Docket No. 391). In that motion, the Debtors acknowledged

that they "do not have sufficient available sources of working capital to carry on the operation of

---

*See* April 6th Tr. at 37-38. McCurnin indicated that in February 2003 Ginsberg did not have any
authority to issue  a rent increase and had since retired. *Id.* at 38.

        [17] It was McCurnin's testimony that in 2004 the tenants of Kennedy Plaza were notified
by the  "owner" of a rent increase effective May 2004, the same month in which the Debtors filed
their chapter 11 petitions, and that DHCR no longer had a supervisory role in Kennedy Plaza. *Id.*
at 39-40. By letter, dated April 15, 2004, McCurnin notified Horwitz that the rent increase had
not been approved by either DHCR or HUD. *See* MLC/UDC Exhibit 17.

their businesses without the use of cash collateral." At the hearing held on February 28, 2006,

the Court scheduled the motion for an evidentiary hearing to be conducted on March 3, 2006.

At the hearing on March 3, 2006, Horwitz acknowledged that the Debtors transferred

approximately $70,000 between November 1, 2005 and November 4, 2005 to a non-DIP account

with Wachovia Bank in the name of Mathematical Bridge LLC. March 3rd Tr. at 48-51.[18] [19]

Horwitz testified that the account had been set up based on the possible divestiture of Kennedy

Plaza in the context of a State Court foreclosure proceeding. *Id.* at 14. He stated that he believed

the "reserve account" was necessary in order to assure the payment of payroll and payroll taxes,

as well as other budgeted items, over which the Debtors might lose control. *Id.* at 15. He

acknowledged that he had personal liability on some of those items. *Id.* At the hearing on April

5, 2006, in connection with the motions herein, Horwitz testified that he did not realize that such

transfers were prohibited. Once he was informed that they were, he closed the account the next

business day and all funds were transferred back to the DIP account. April 5th Tr. at 102.

Horwitz admitted that under the terms of the cash collateral order in existence at the time,

as well as the associated budget, Mathematical Bridge Corporation was only entitled to receive

$5,900 in November 2005. The November 2005 budget provided for a total of $105,854.50 in

expenses. However, the Debtor actually expended $140,000. March 3rd Tr. at 58. Horwitz

---

[18] Horwitz acknowledged that Mathematical Bridge LLC was not a debtor. *See* March 3rd Tr. at 53. He explained that Mathematical Bridge LLC owns the assets of Mathematical Bridge Corporation. *Id.* at 18. He explained that the management fee is paid by the Debtors to Mathematical Bridge LLC, but it is Mathematical Bridge Corporation that actually manages Kennedy Plaza. *Id.* at 65-66.

[19] This occurred approximately one week after the Court's October 2005 Decision in which it granted MLC/UDC relief from the automatic stay.

acknowledged that in creating the reserve account there were December items that were included in November because of the concern that the Debtors might lose control of Kennedy Plaza. *Id.* at 72. Indeed, Horwitz testified that if the Court had not stayed the effect of its October 2005 Decision, he would not have transferred the money from the Wachovia reserve account back into the Debtors' DIP account.[20] *Id.* at 97-98. However, because of the stay granted by the Court, he testified to various transfers back to the Debtors' DIP account. *Id.* at 63-65. The fact that the Debtors were over budget in the month of November, according to Horwitz, was merely a matter of timing. For example, Mathematical Bridge LLC was paid approximately $12,000 in November 2005, $5,900 of which was actually to cover the management fee for December 2005.

Horwitz acknowledged that the Wachovia reserve account statements were not attached to the operating reports filed with the Court. According to Horwitz, Conn & Company, P.C., the Debtors accountants, indicated that because it was not a DIP account, it was not appropriate to include it with the reports. *Id.* at 75.

At the completion of the hearing on March 3, 2006, the Court issued an Order on March 14, 2006 (Docket No. 428) ("Cash Collateral Order") requiring that all cash collateral, including rents, be immediately deposited by the Debtors into a lock box account established by MLC at a bank located in Utica, New York. The Debtors were also required, on a monthly basis, to

---

[20] At the hearing on April 5, 2006, in connection with the motions here, Horwitz testified that he had caused to be transferred into the Wachovia reserve account $9,471, identified as a "counter deposit" on February 15, 2006. *See* MLC/UDC's Exhibit 10. Indeed, the statement for the Wachovia reserve account indicates a total of $24,294.50 in deposits for the month of February 2006. *Id.* Horwitz could not recall whether he had advised the Court of those additional transfers at the evidentiary hearing conducted on March 3, 3006, in connection with the Debtors' cash collateral motion. However, he pointed out that they were reflected in the statement attached to the operating report for February 2006. *Id.*

provide proof to the UST of all required deposits, all payments and all payments of payroll taxes

or benefits.  The Debtors were authorized to make a bi-weekly request, to be approved by MLC,

for a transfer of funds from the lock box account to the DIP account for the purposes of paying

expenses in an approved budget.  In addition, the management fee to be paid to Mathematical

Bridge Corporation was reduced to $3,000 per month, effective February 28, 2006.  Ultimately,

the Cash Collateral Order authorized the Debtors' use of cash through May 5, 2006.[21]

Postpetition Financial Status of the Debtors

From May 21, 2004 through December 31, 2004, Debtors had a net operating loss on an

accrual basis of $208,512.22.  *See* June 2nd Tr. at 92.  Debtors' net operating loss on an accrual

basis for 2005, based on the Monthly Operating Report for December 1- 31, 2005, filed February

21, 2006 (Docket 384), amounted to $555,114.50.  In addition, the Debtors had a net operating

loss on an accrual basis of $116,612.87 for the two months ending February 28, 2006.[22]  *See* UDC

Exhibit 10.

---

[21]  At a hearing at the Court's regular motion term in Syracuse, New York, on June 6,
2006, MLC/UDC represented to the court that following the dismissal of the appeal of the
October 2005 Decision, a receiver had been appointed in the foreclosure action in State Court and
that the receiver had retained a management company for Kennedy Plaza.  In response to the
Debtors' request for an extension of their use of cash collateral, the Court expressed the view that
it may well be moot given the appointment of the receiver.  However, based on the representation
by Debtors' counsel that they intended to seek reconsideration of the appointment of the receiver
by the State Court, this Court agreed to adjourn the Debtors' motion for a month.

[22]  The most recent Monthly Operating Report for April 2006, filed May 15, 2006, reflects
a net operating loss on an accrual basis of $242,188.11 and cash on hand of $56,521.84 (Docket
No. 512).  (The Report for April 2006 actually reflects a net operating loss of $83,256,539.89,
which the Court believes is an error based on its own calculations.)   Thus, the Court calculates
that the net operating loss on an accrual basis since filing on May 21, 2004, approximates $1
million.

Debtors ceased making regular debt service payments to UDC in 1998.  *See* June 2nd Tr.

at 51.  HUD pays 75% of the monthly debt service payment owed by Debtors to UDC.  *Id.*  The

unpaid debt service payments owed by the Debtors accrue at the rate of $15,000 each

month/$180,000 each year.  *Id.*

## DISCUSSION

> The bankruptcy court has wide discretion to determine if cause exists and how to
> ultimately dispose of the case. (citations omitted).  Conversion or dismissal of a
> Chapter 11 case is a drastic measure and the burden is on the movant to prove it
> is warranted and not premature. (citations omitted).
>
>     *    *    *    *    *    *    *    *
>
> Chapter 11 is not a game to be used for sport against creditors for the benefit of
> insiders.  It is part of Title 11's intricate statutory scheme, enacted by Congress
> under the authority of Article I of the Constitution of the United States, to provide
> entities in financial distress with the breathing room to get back on their feet while
> simultaneously protecting the rights of those entities, generally speaking the
> creditors, unfortunate enough to have become involved with a debtor. (citation
> omitted).  It functions as a shield, in exchange for certain sacrifices, such as
> honest and continued public disclosure, and is never to be used as a sword.

*In re Sal Caruso Cheese, Inc.*, 107 B.R. 808, 817, 818 (Bankr. N.D.N.Y. 1989).

Initially, the Court would note that when the UST first filed its motion to convert the

Debtors' cases on January 31, 2006, the Debtors had failed to file operating reports since October

2005 and had failed to pay the UST quarterly fees for the fourth quarter of 2005.  In *Sal Caruso*,

this Court took exception to what it described as the debtor's "absolute disregard of the strictures

of the Bankruptcy Code" and expressed the belief that "a debtor should [not] be coddled into

complying with the Code and then congratulated upon each instance of substantial compliance."

*Id.* at 818. In the case before the Court, the Debtors rectified their noncompliance by eventually filing the operating reports for November and December 2005 on February 21, 2006. In addition, payment apparently has been made of the UST fees for the fourth quarter of 2005.

Another concern expressed by the UST in its motion was the Debtors' failure to retain substitute counsel and to file a plan and disclosure statement. On February 9, 2006, the Court signed an Order granting the Debtors' application to employ Raichle Banning Weiss, PLLC as counsel (Docket No. 374),[23] approximately a week after the UST's motion. On March 31, 2006, two months after the UST filed its motion, the Debtors filed the Second Amended Disclosure Statement and Amended Chapter 11 Plan.

The Debtors have made an effort to address the UST concerns regarding the filing of monthly operating reports and proceeding with confirmation as required by the Code since employing new counsel. Thus, the basis for conversion, as set forth by the UST in its motion, no longer exists. However, the Court cannot ignore the problems which also came to light in connection with the Debtors' motion for the continued use of cash collateral, which was heard on March 3, 2006, subsequent to the motions herein and prior to the evidentiary hearings in April 2006, that

> the debtor has been operating in a manner which is not only contrary to the various cash collateral orders one through nine but also in a manner in which the Court believes is somewhat inappropriate within the four corners of Chapter 11 of Title 11 of the United States Code, and particularly, the Court fixates on the creation of this so-called reserve account which Mr. Horwitz was very honest in explaining was done in the event that this Court did not stay its order granting UDC relief from the stay. But honest or otherwise, that was an inappropriate act

---

[23] By Letter Decision and Order, dated December 20, 2005 (Docket No. 353), the Court had granted the request by the law firm of Hancock & Estabrook, LLP to withdraw as attorneys for the Debtors.

by the debtor.

It goes contrary to every tenant and requirement of Title 11 – Chapter 11, and as I indicated in chambers, it is in effect or was in effect the so-called straw that broke the camel's back.

March 3rd Tr. at 100.

According to Horwitz, his actions were taken apparently without the advice of legal counsel in response to the Court's October 2005 Decision lifting the automatic stay and allowing UDC to proceed with foreclosure of Kennedy Plaza. The Court's Conditional Order of March 14, 2006, approving the Debtors' use of cash collateral through May 5, 2006 and requiring, *inter alia*, the timely filing of the Monthly Operating Reports, placed the onus on the Debtors to comply with their fiduciary duties as set forth in the Code or face the consequences of being without funds for the operation of Kennedy Plaza.

Within this context, there is still to be considered the motion of MLC/UDC seeking conversion of the Debtors' cases. In this regard, the Court must "scrutinize the evidence to determine, on an objective basis, whether there is some reasonable possibility of successful reorganization without inordinate delay and whether the debtor[s] entered the bankruptcy process with any real intention to reorganize rather than stall." *In re Marion Street Partnership*, 108 B.R. 218, 223 (Bankr. D.Minn. 1989). Indeed, Code § 1112(b), as it existed prior to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), signed into law on April 20, 2005, and made applicable to cases filed after October 16, 2005, sets forth ten non-exclusive factors to be considered in determining whether cause exists to convert or dismiss a case.[24] Of

---

[24] "While the enumerated examples of 'cause' to convert or dismiss a chapter 11 case now listed in § 1112(b)(4) have changed under BAPCPA, the fact that they are illustrative, not exhaustive has not." *In re 3 Ram, Inc.*, __ B.R. __, 2006 WL 1517354 at * 2 (Bankr. E.D.Pa.

22

particular interest to the motion herein is subsection (1), which requires that the Court examine

whether there has been a "continuing loss to or diminution of the estate and absence of a

reasonable likelihood of rehabilitation."  11 U.S.C . § 1112(b)(1).  Both factors must be present

if the subsection is to serve as a basis for the relief sought.  *See In re Original IFPC*

*Shareholders, Inc.*, 317 B.R. 738, 742 (Bankr. N.D. Ill. 2004).

    In *IFPC Shareholders* the debtor filed a chapter 11 petition on July 6, 2004, following two

state court judgments entered against it after a bench trial and then a jury trial in which the debtor

had unsuccessfully prosecuted a trade secret misappropriation claim.  In the bankruptcy case, the

debtor expressed the intent to use approximately $17,000 on deposit in a bank account to

prosecute an appeal seeking a third trial and to proceed with a third trial if successful on appeal.

The debtor proposed to fund a plan with the proceeds of the third trial.  *Id.* at 741.  The court in

*IFPC Shareholders* noted that the debtor had an ongoing negative cash flow, given that it sold

neither goods nor services, and yet was continuing to incur postpetition UST fees and

administrative costs comprised largely of attorneys' fees.  *Id.* at 742.  The court pointed out that

> a traditional Chapter 11 case . . . whether the debtor has a "reasonable likelihood
> of rehabilitation," would not turn on the anticipated future outcome of a single
> lawsuit, because cash flow from another valuable activity would provide the
> means for paying at least a portion of pre-petition debt from post-confirmation
> profits.   In this unusual case, however, the "reasonable likelihood of
> rehabilitation" test must be conflated with the anticipated future outcome of a
> single lawsuit.  This would be a difficult task were the cause of action at the
> discovery stage, having never been tried once . . . . Aside from the unwieldy task
> of acquiring and then taking a third bite at the apple, the debtor has no other
> "business plan" that would reverse the negative cash flow.  Its "premise that
> outcomes in pending litigation favorable to him will cure [its] financial ills is pure
> speculation. (citation omitted).  'When visionary schemes for rehabilitation entail
> significant risk to creditors without any reasonable probability that the debtor can

2006).

successfully rehabilitate, conversion or dismissal is generally in order.'" ( citation omitted).

*Id.* at 742-43.   The court in *IFPC Shareholders* concluded that cause for conversion or dismissal had been established pursuant to Code § 1112(b)(1).   Ultimately, the court held that the case should be dismissed.

Admittedly, there are factual distinctions to be drawn between *IFPC Shareholders* and the case now before this Court.  For example, the Debtors had a cash flow derived from rental income from the operation of Kennedy Plaza.  Unfortunately, they did not generate sufficient monies to meet their monthly expenses, exclusive of the approximate $15,000 in monthly payments they owe MLC/UDC on its mortgage as reflected in the negative net profit and loss statements since filing their petitions.  The Debtors point out that if successful in their litigation against DHCR, they expect to obtain a 10% rental increase, which they estimate will generate an additional $100,000 per year.  However, this would still be insufficient to meet their obligations to MLC/UDC of $180,000 per year.  There is the additional impediment that the income generated by Kennedy Plaza no longer belongs to the Debtors.  Instead, the rents are being collected by the receiver appointed in the State Court foreclosure action.  The proposed refinancing of Kennedy Plaza and its decoupling are also rendered moot under those circumstances.  The Debtors' Amended Chapter 11 Plan makes no provision for any capital infusion by investors.  Thus, there appears to be no monies available to litigate against MLC/UDC in either this Court seeking turnover of the approximately $2.1 million in Settlement Proceeds or in the Florida state court on the Civil Theft Action.

Furthermore, even if the Debtors had the funds to go forward with the litigation in this

24

Court, there is still the problem of plan confirmation.   MLC/UDC calculates that upon

confirmation the Debtors will need cash of approximately $1.352 million[25] to pay administrative

claims pursuant to Code § 1129(a)(9) on the effective date of the plan.  Yet, as of April 30, 2006,

the Debtors had only $56,521.84 cash on hand, up from the $30,342.91 on hand on February 28,

2006, as noted on MLC/UDC's Exhibit 10.

MLC/UDC's stated opposition to the Debtors' Plan also creates an insurmountable barrier

to its confirmation.  As this Court previously noted in its October 2005 Decision:

> Code § 1126(c) requires acceptance by creditors "that hold at least two-thirds in
> amount and more than one-half in number of the allowed claims of such class held
> by creditors . . . that have accepted or rejected such plan."  11 U.S.C. § 1126(c).
> In this case, the Debtors have identified unsecured claims of $3.533 million,
> exclusive of UDC's deficiency claim of $5.742 million,[26] based on a fair market
> value for Kennedy Plaza of $7.135 million and a total claim of $12.877 million.
> Combining the two, namely $3.533 million and $5.742 million, unsecured debt
> totals approximately $9.275 million.  At 62% of Class 6, UDC controls the class
> for acceptance purposes and has indicated that it will not accept the proposed
> treatment.

October 2005 Decision at 22-23.

The record before the Court establishes a continuing loss and diminution of the Debtors'

estates.  In addition, it is evident that there is no realistic likelihood of rehabilitation, particularly

given the fact that the foreclosure action is proceeding in State Court.  Because UDC is moving

forward with its foreclosure of its mortgage on Kennedy Plaza, any efforts on the part of the

---

[25]  MLC/UDC include a $67,000 administrative claim of Niagara Mohawk (National
Grid).  Actually,  by Order, dated April 3, 2006, the Court awarded an administrative expense
claim of $76,075.38 to Niagara Mohawk and scheduled an evidentiary hearing to determine the
balance of the claim due to Niagara Mohawk.

[26]  In its Post-trial Memorandum of Law, filed May 5, 2006, UDC asserts that its allowed
deficiency claim is currently $6.228 million, which represents 64% of the class of unsecured
creditors.

Debtors to obtain a rent increase from DHCR or to decouple and/or obtain refinancing as part of their reorganization have been rendered moot.  Furthermore, the possibility of successful litigation is too remote and "visionary," in the view of the Court.  In this regard, the Debtors have also failed to show an ability to effectuate a feasible plan, which serves as additional "cause" for conversion or dismissal pursuant to Code § 1112(b)(2).

As noted previously, it is within the Court's discretion to convert or dismiss a case, provided the best interests of the creditors and the estate are served.  The UST and MLC/UDC, both of whom are supported in their requests by DHCR, seek conversion of the cases to chapter 7.  Yet, the Court also has the option of dismissing the case for cause *sua sponte*.  *See Pleasant Pointe Apartments, Ltd. v. Kentucky Housing Corp.*, 139 B.R. 828, 831(W.D. Ky. 1992).  The Court recognizes that such a determination requires a strong evidentiary showing and consideration of the merits of the Debtors' Plan given the harshness of such a result.  *See In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 985 (Bankr. N.D.N.Y. 1988).  The Court is of the opinion that such an evidentiary showing has been made by MLC/UDC.  As discussed above, MLC/UDC has established "cause" pursuant to Code § 1112(b)(1), as well as (b)(2).  The Court can envision no real benefit to converting these cases.  The time set forth in Code § 546(a)(1) for commencement of potential avoidance actions under Code § 544, 545, 547, and 548 expired, thereby preventing a chapter 7 trustee from pursuing any avoidance actions that might have existed and seeking recovery on behalf of unsecured creditors.  In addition, MLC/UDC obtained relief from the stay to foreclose upon the Debtors' primary asset some months ago and is proceeding forward in the State Court.  Furthermore, it is estimated that UDC and HUD comprise approximately 90% in amount of the unsecured claims.  The administrative expenses that would

be incurred in getting a chapter 7 trustee "up to speed" should the case be converted could well exceed the claims of the remaining unsecured creditors.  Dismissal of the case will enable UDC and HUD, as well as the Debtors, to pursue their rights in other forums.[27]  Furthermore, allowing the parties to proceed in alternative forums, and any delay that may entail, will not impact greatly on the other unsecured creditors in the case who have not participated in the proceedings over the past two years.[28]  It would appear that the only constituency that may be seriously impacted by dismissal of the case will be the class of equity holders and limited partners of the Debtors, and the Code affords them little in the way of protection to cause this Court any concern.

Based on the foregoing, it is hereby

ORDERED that the case of State Street Associates, L.P. is dismissed; and it is further

ORDERED that the case of State Street Houses, Inc. is dismissed.

Dated at Utica, New York

this 21st day of June 2006

/s/    Hon. Stephen D. Gerling
STEPHEN D. GERLING
Chief U.S. Bankruptcy Judge

---

[27]  The Court acknowledges that the Debtors continue to maintain a claim for the turnover of the Sarabond Settlement Proceeds and for an accounting, but the Court is convinced that even if successful in recovering on those claims, any recovery would only be used to set off the obligation owed to UDC on its mortgage, and there would be nothing for a chapter 7 trustee to recover on behalf of the unsecured creditors.

[28]  Notably, the UST was unable to appoint a Creditors Committee in the case due to an apparent lack of interest on the part of the unsecured creditors and perhaps the recognition that the case is basically a two party dispute from which any recovery is likely to be de minimus given the extent of UDC's security interest.